Mary Jo O'Neill, AZ Bar No. 005924
Jeff A. Lee, OK Bar No. 13483
Lucia Moran, NM Bar No. 151652
**EQUAL EMPLOYMENT OPPORTUNITY**
**COMMISSION,**
**Phoenix District Office**
3300 North Central Ave., Suite 690
Phoenix, AZ 85012
Telephone: (602) 661-0059
Fax: (602) 640-5071
Email: mary.oneill@eeoc.gov
　　　jeff.lee@eeoc.gov
　　　lucia.moran@eeoc.gov

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Equal Employment Opportunity
Commission,

　　　　　Plaintiff,

　　　v.

Central Transport, LLC,

　　　　　Defendant.

**CIVIL ACTION NO.:**

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e *et seq.* ("Title VII") and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of sex and to provide appropriate relief to Charging Party Maquater Hamilton ("Hamilton"), Charging Party Cassandra Coleman, ("Coleman") and other aggrieved individuals who were adversely affected by such practices during their attempts to

1

seek employment with Defendant Central Transport, LLC ("Central Transport" or "Defendant"). As stated with greater particularity below, the Equal Employment Opportunity Commission ("EEOC") alleges that Central Transport failed to hire Hamilton, Coleman, and other qualified female applicants because of their sex. Defendant's hiring practices have been undertaken with the purpose and have had the effect of denying women employment because of their sex in violation of Title VII. The EEOC seeks monetary and equitable relief for Hamilton, Coleman, and all aggrieved individuals, consisting of a class of qualified female applicants who applied for truck driver positions with Central Transport from January 2016 to the present but were denied jobs based on Central Transport's discriminatory hiring decisions. The EEOC alleges Central Transport also failed to maintain job applicant and hiring-related records in violation of 29 C.F.R. § 1627.3 and Title VII .

### JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(1) and (3) and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were committed in multiple locations nationwide, including within the jurisdiction of the United States District Court for the District of Arizona.

## PARTIES

3. The EEOC is an agency of the federal government of the United States of America charged with the administration, interpretation and enforcement of Title VII and is expressly authorized to bring this action by § 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1).

4. Central Transport is a trucking company which provides LTL (less-than-load) delivery services nationwide.

5. At all relevant times, Central Transport has continuously been doing business in interstate commerce within the State of Arizona and nationwide under §§ 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

6. Central Transport is registered as an Indiana Limited Liability Company with its principal place of business and company headquarters in Warren, Michigan.

7. Central Transport operates more than 200 terminals in the United States.

8.  At all relevant times, Central Transport has continuously employed 501 or more employees in each of 20 or more calendar weeks for each calendar year, from 2016 to present.

## ADMINISTRATIVE PROCEDURES

9. More than thirty days before the institution of this lawsuit, Maquater Hamilton and Cassandra Coleman filed charges with the EEOC (Charge Nos. 540-2016-03116 and 540-2020-01845) alleging Defendant violated Title VII.

10. The EEOC provided Defendant with notice of Hamilton's charge of discrimination on September 29, 2016 and notice of Coleman's charge of discrimination on February 10, 2020.

11. The EEOC conducted an investigation regarding the allegations made in Hamilton's and Coleman's charges of discrimination.

12. On October 16, 2023, the EEOC issued Letters of Determination for both Hamilton's and Colemans charges of discrimination to Defendant, finding reasonable cause to believe that Defendant had violated Title VII.

13. Prior to filing suit, the EEOC invited Defendant to join with the EEOC in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

14. The EEOC and Defendants participated in the conciliation process.

15. On March 6, 2024, the EEOC issued Notices of Conciliation Failure for both Hamilton's and Coleman's charges of discrimination to Defendant, advising Defendant that the EEOC was unable to secure conciliation agreements acceptable to the EEOC.

16. All conditions precedent to the institution of this lawsuit have been fulfilled.

### STATEMENT OF CLAIMS

17. From January 2016 to present, Defendant has engaged in unlawful employment practices in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by refusing and failing to hire female truck driver applicants because of their sex, female, on a nationwide basis from 2016 to the present.

18. Central Transport's decisions with regard to hiring qualified female truck driver applicants, when compared to male applicants, resulted in significantly fewer female applicants being hired than would be statistically expected on a nationwide basis for the years 2016 through January 2022.

19. Central Transport submitted EEO-1 consolidated reports and unit reports that contain employee gender and job classifications for the years 2016–2022, but claimed not to have gender information for the employees hired for the same time period.

20. However, when the EEO-1 reports were compared with all applications for the same period (the years 2016–2022), the number of female applicants hired as compared to male applicants for the same truck driving positions resulted in a statistically significant disparity in the ratio of male to female truck drivers hired.

21. When the statistics were combined with the numerous anecdotal testimonies of the qualified female truck driver applicants who were rejected, the EEOC found cause that Central Transport had subjected the qualified female applicants to disparate hiring practices in violation of Title VII based on their sex.

### The hiring process for Central Transport.

22. Central Transport operates up to 200 terminals nationwide, including terminals in Phoenix, Arizona and Portland, Oregon.

23. Applications for employment with Central Transport were completed and submitted by prospective candidates at local terminals across the country from 2016 to June 2020, and in electronic form in Tenstreet software thereafter.

24. Central Transport's recruiting and hiring department and safety department (collectively "Recruiting Department") operate out of its corporate office in Warren, Michigan and were ultimately responsible for all hiring decisions nationwide.

25. During the EEOC investigation, Central Transport's Phoenix Terminal Manager, Jason Faulkner and Central Transport's El Paso Terminal General Manager, Joe Lopez, both testified that Central Transport's minimum qualifications and requirements for a truck driver position were for the applicant to have six months verifiable truck-driving experience within a 12-month period (three-months for city drivers), have a commercial driver's license ("CDL") and have the willingness to obtain a hazmat endorsement.

26. During the EEOC investigative interviews, the female applicants who applied to Central Transport were typically overqualified for Central Transport's truck driver positions, meaning they met or exceeded the minimum qualifications.

27. After a candidate submitted an application to personnel at a local terminal, the next step in the hiring process was for the paper application to be sent to corporate headquarters via fax or email.

28. Central Transport's routine recruiting and hiring practice was to have applicants for truck driver positions remain at the local terminal while the local personnel sent their job applications to the Recruiting Department at the company offices in Warren, Michigan for initial assessment.

29. Once a local terminal sent an application to Central Transport's Recruiting Department via fax or email, a staffing specialist from the Recruiting Department was supposed to perform an individualized assessment of each application to determine whether or not the applicant satisfied the minimum requirements to qualify for a particular truck driver position. The applicants were often told to wait at the terminal for an interview.

30. Once Central Transport's Recruiting Department reviewed an application, Central Transport's practice was for Recruiting Department staff to then call the local terminal the same day to notify the local terminal whether the Recruiting Department wanted to interview the candidate on site via telephone.

31. During the EEOC investigation, the EEOC learned that many of the female applicants for truck driver positions were never interviewed even though they met or exceeded the minimum qualifications for the truck driver positions.

32. The EEOC investigation uncovered that Central Transport's failure to interview qualified applicants for available job positions was inconsistent with its routine hiring and recruiting practices and procedures.

33. When Central Transport's Recruiting Department interviewed applicants, the Recruiting Department would then inform the local terminal whether Central Transport would offer employment to the applicant.

34. If the Recruiting Department informed a local terminal that Central Transport was offering a job to an applicant, the local terminal would then inform the applicant how to proceed to the second stage of the hiring process.

35. Sometime after June 2020, Central Transport changed its hiring process, eliminating the use of paper employment applications.

36. Sometime after June 2020, Central Transport changed its hiring process, requiring all applicants to submit electronic applications to Central Transport via the TenStreet electronic application software program.

37. Sometime after June 2020, applicants for Central Transport truck driver positions could submit electronic (or "web-based") applications either remotely online or at a local terminal.

38. Female applicants who applied to Central Transport for a truck driver position were not treated consistent with Central Transport's routine recruiting and hiring practices for the truck driver positions.

### *Charging Party Hamilton*

39. At all relevant times to this lawsuit, Charging Party Hamilton was a female truck driver.

40. In September 2016, Hamilton applied to be a truck driver with Central Transport.

41. Hamilton applied in-person at Central Transport's former local terminal location at 5939 West Washington, Phoenix, Arizona 85043.

42. At the time Hamilton submitted her paper application with Central Transport in 2016, she had approximately 15 years of truck-driving experience.

43. After Hamilton arrived at the local terminal in Phoenix, she completed an application for a truck driver position because she knew Central Transport was hiring.

44. She informed a male employee that she was finished with the application and sat down to wait for an interview.

45. The male employee who took the application from Hamilton went to talk to another man, and returned to Hamilton to tell her she would not be interviewed.

46. Upon asking why she would not be interviewed, the male employee responded that he did not know and noted that her application looked fine.

47. The Central Transport employee did not provide a justification for why Hamilton would not be interviewed.

48. Hamilton observed that she was the only female applicant for the truck driver position the day she applied at the Phoenix Terminal in 2016.

49. The husband of one of Hamilton's friends, a male truck driver and Central Transport employee named Demetrius Saunders, told Hamilton that Central Transport was still hiring and accepting applications for truck driver positions in September 2016.

50. Saunders explained his hiring process in detail, stating that when he went to apply at the Phoenix Terminal in May 2016 in person, Cole David Baldwin, a manager for Central Transport at the time, handed him an application to fill out.

51.  When Saunders finished filling out the application, he gave it to Baldwin and remained at the terminal as instructed.

52. Baldwin then scanned and sent Saunders' application to Central Transport's Recruiting Department, following Central Transport's routine recruiting and hiring procedures.

53. A female employee at Central Transport's corporate headquarters then called Saunders while he was still at the local terminal in Phoenix, interviewed him and then informed him of the next steps to complete the hiring process, which included a background check, a check on his driving status, and a requirement to take a drug test.

54. According to Saunders, he and other male applicants were hired less than a week after filling out their applications and being interviewed.

55. At the time Central Transport hired Saunders at the Phoenix Terminal in May 2016, Saunders only had two months of truck driving experience.

56. Saunders, a male applicant, did not meet Central Transport's established minimum experience qualifications.

57. Central Transport failed to comply with its established recruiting procedures and practices upon receiving Hamilton's application in September 2016.

58. In contrast to its handling of Saunders application, Central Transport never scanned Hamilton's application or sent it to the Recruiting Department at its headquarters in Warren, Michigan.

59. After Hamilton did not hear back from Central Transport regarding her application for employment, Hamilton filed a charge of discrimination with the EEOC in September 2016.

60. Hamilton's charge of discrimination alleged that Central Transport discriminated against her on the basis of sex by failing to hire her for a truck driver position because she was female, in violation of Title VII.

61. After receiving notice from the EEOC of Hamilton's charge of discrimination, Central Transport searched for Hamilton's application at the corporate offices in Michigan but could not find it.

62. Ultimately, Central Transport disclosed to the EEOC it later found Hamilton's application still at the local terminal in Phoenix.

63. During the EEOC's investigation of Hamilton's charge of discrimination, Central Transport's Senior Manager of Labor Relations, Matthew Shad, was interviewed under oath in March 2019.

64. During this March 2019 interview, Shad testified that Hamilton's application did not follow the routine process and never made it to the Recruiting Department.

65. During this March 2019 interview, Shad also admitted that Hamilton's employment application should have qualified her to go past the initial screening and into Central Transport's recruiting queue at corporate headquarters.

66. Shad also admitted that any discrepancies in Hamilton's application would be the kind that warranted clarifying questions during a personal interview.

67. The EEOC also interviewed Baldwin during its investigation of Hamilton's charge of discrimination.

68. Baldwin was the Assistant Terminal Manager at the local terminal in Phoenix at the time of his EEOC interview in March 2018 and had previously been the Terminal Manager.

69. In his EEOC interview, Baldwin testified that Central Transport's Recruiting Department had a practice of allowing applicants to add missing information or to correct information on an application after an initial review; stating this would include correcting errors such as job history or adding a missing salary or reference.

70. During the period of time shortly before and after Hamilton applied to Central Transport, from August 8, 2016, to October 21, 2016, Central Transport hired twenty male truck drivers at its local terminal in Phoenix.

71. Central Transport did not hire any female applicants from August 8, 2016, to October 21, 2016.

72. Saunders confirmed that in September 2016 there were no female truck drivers working at the local terminal in Phoenix.

73. Saunders also observed, and was told by other male Central Transport truck drivers, that Central Transport had never had a female truck driver at the Phoenix Terminal as of September 2016.

74. Saunders' information , that Central Transport had never had a female truck driver at the Phoenix terminal as of September 2016, was consistent with the testimony provided by the Phoenix Terminal's Assistant Manager Baldwin during his interview with the EEOC.

***Charging Party Coleman***

75. In 2016, Charging Party Coleman was a female truck driver with approximately 21 years of truck driving experience.

76. In 2016, Coleman was referred to Central Transport by a friend who saw a job posting for truck drivers on Craigslist and ZipRecruiter.

77. Coleman went to Central Transport's Phoenix Terminal in November 2016 to fill out an application for a truck driver position.

78. When Coleman asked a male dispatcher at the Phoenix Terminal to fill out an application, he told her the company had all the people it needed.

79. The male dispatcher at the Phoenix Terminal then tried to dissuade Coleman from filling out an application for the truck driver position, telling her, "it's not going to do you any good" and "maybe just come back in a couple of weeks and you can fill out an application then."

80. Coleman then asked the male dispatcher at the Phoenix Terminal whether Central Transport hired female truck drivers and was told he wasn't sure how many women work there presently, if any.

81. Coleman, because she had 21 years of truck driving experience and a clean driving record, applied for a truck driver position at the Phoenix Terminal in November 2016.

82. In November 2016, after turning in her completed application at the Phoenix Terminal, Coleman was not interviewedby anyone.

83. In November 2016, after submitting her completed application at the Phoenix Terminal, Coleman was not hired by Central Transport.

84. During the time period immediately preceding and after Coleman submitted her application at the Phoenix Terminal in 2016, Central Transport hired ten male truck drivers.

85. During the EEOC investigation, Central Transport was not able to produce a copy of the application Coleman filed at the Phoenix Terminal in 2016.

86. Coleman again applied for a truck driver position with Central Transport at their company's Portland, Oregon terminal on or about October 14, 2019.

87. Shortly after she had submitted her completed application at Central Transport's

Portland Terminal, Coleman received a text message from a Central Transport employee named Cody.

88.  The text from the Central Transport employee named Cody stated he had received Coleman's application for a truck driver position and instructed her to come into the Portland Terminal to be interviewed for a possible truck driving position.

89. When Coleman went to the Portland Terminal location to be interviewed in October 2019, no Central Transport employee would interview her, and she was told by Central Transport employees that the truck driver position had been filled.

90. During the time period immediately preceding and after Coleman submitted her application at the Portland terminal in October 2019, Central Transport's Portland Terminal hired four male truck drivers.

91. Coleman filed her charge of discrimination with the EEOC in February 2020 alleging Central Transport discriminated against her on the basis of sex by failing to hire her for a truck driver position because she was female, in violation of Title VII.

92. During the EEOC's investigation of her charge of discrimination, Central Transport informed the EEOC that it could not locate Coleman's 2016 and 2019 employment applications for the truck driver positions with the Phoenix and Portland Terminals.

***Central Transport's Procedures According to Local Terminal Management Officials***

93. In his March 2018 interview with the EEOC, Baldwin, who was at the time the Assistant Terminal Manager at the local terminal in Phoenix, testified he had been a manager at the Phoenix Terminal for approximately three to four years.

94. Baldwin admitted that during the three to four years he worked at the Phoenix Terminal they received applications from female applicants.

95. Baldwin testified that he could not recall a female ever being hired at the Phoenix Terminal during the time he had been working there.

96. Baldwin also could not recall a female ever being interviewed for a truck driver position at the Phoenix Terminal during the time he had been working there.

97. In March 2018, the EEOC also interviewed Jason Faulkner, who was the Phoenix Terminal Manager at the time of the interview.

98. Faulkner told the EEOC that he had worked for Central Transport for eleven years and had been the terminal manager at the Phoenix Terminal location for about nine months at the time of his interview.

99. Faulkner also testified that no female truck drivers worked at the Phoenix Terminal during his eleven years working there.

100. Faulkner further testified that he is not aware of any female having ever worked at the Phoenix terminal during his eleven years there.

101. In March 2020, the EEOC interviewed Joe Lopez, who was the El Paso Terminal Manager at the time of his interview.

102. During the interview, Lopez testified that the El Paso Terminal, which he supervised, had approximately ninety truck drivers but only one was female.

*Detroit, Michigan Terminal*

103. Maronda Biddles, a female truck driver, applied for a truck driver position at Central Transport's local terminal in Detroit, Michigan in November 2016.

104. When she went to submit her application, Biddles was accompanied by her male cousin, Victor Edwards, who also applied for a truck driver position at the same time.

14

105. Both Biddles and Edwards completed and turned in paper applications for truck driver positions.

106. After Biddles and Edwards completed their applications, they both then left the local terminal.

107. Approximately ten minutes after they left, they both realized that they forgot to include some information on their applications.

108. Both Biddles and Edwards returned to the Detroit Terminal the same day and requested their applications to add the missing information.

109. A male employee who was onsite at the Detroit Terminal at the time quickly retrieved Edwards' application.

110. The same male employee had a hard time finding Biddles' application.

111. Subsequently, both Biddles and Edwards witnessed the male employee remove Biddles' application from a trash can.

112. After retrieving Biddles' application from the trash can, the male employee handed it to Biddles to add the missing information.

113. Central Transport subsequently hired Edwards for a truck driver position.

114. Even though Biddles met the qualifications for a truck driver position with Central Transport, Biddles, unlike her male cousin Edwards, never received an interview from Central Transport regarding her application.

115. Despite Biddles calling Central Transport's Detroit Terminal to check on the status of her application, she never received a call back from anyone.

*Dunbar, West Virginia Terminal*

116. In September 2017, Sandra Johnson, a female truck driver, submitted a paper application in-person at Central Transport's local terminal in Dunbar, West Virginia.

117. Johnson stated that the Dunbar Terminal manager faxed the application to Central Transport's home office while she was still onsite.

118. After he had faxed the application to the Central Transport home office, the Dunbar Terminal manager told Johnson that the corporate home office had instructed him to continue looking for other candidates.

119. Central Transport's Dunbar Terminal manager also told Johnson that he was not allowed to hire women.

*Memphis, Tennessee Terminal*

120. On separate occasions during the relevant time period, a female truck driver, who lived in Memphis, Tennessee, applied for a truck driver position with Central Transport.

121. She submitted her first application in 2018.

122. At the time, the "recruiter" at the Memphis Terminal, who was a Caucasian male, took her application and threw it in the trash.

123. When she applied for a truck driver position with Central Transport a second time at the Memphis Terminal in either 2020 or 2022, Central Transport did not interview her.

*Bartlett, Tennessee Terminal*

124. On or about November 2019, after seeing a banner seeking local drivers, a female truck driver applied for a position at Central Transport's local terminal in Bartlett, Tennessee.

125. She had about 15 years of truck driving experience, had the required commercial driver's license, and had a perfect driving record at the time she applied for the truck driver position with Central Transport in 2019.

126. She completed an application that was over 20 pages and dropped it off at the Bartlett Terminal.

127. After not having heard back from Central Transport for a few weeks, she called the Bartlett Terminal but received no response.

128. When she did not get a call back from Central Transport, she called Central Transport again to inquire about why things were taking so long.

129. During the call with the Bartlett Terminal, a male "recruiter" told her she would have to wait, and if she could not wait, that was too bad.

130. This female applicant never received an interview from Central Transport.

131. Instead, Central Transport called her and said she was not selected for the job because she was currently employed driving trucks for another company.

132. The female applicant informed Central Transport that her current job was a temporary position while she was waiting on Central Transport to get back with her.

133. Central Transport still denied her the truck driver job.

*Horn Lake, Mississippi Terminal*

134. In 2020 and 2023, a female truck driver applied for a truck driver position at Central Transport's local terminal in Horn Lake, Mississippi.

135. She had previously applied for a forklift operator position at Central Transport's Horn Lake Terminal in 2017.

136. Central Transport never interviewed her the positions to which she applied.

137. In 2020, the female applicant applied for a truck driver position with Central Transport's Horn Lake Terminal after seeing a Central Transport job listing for a truck driver position on Indeed.com.

138. Prior to her 2020 online application, the female applicant had about 11 months of truck driving experience.

139. Despite meeting Central Transport's minimum requirements for a truck driver position in 2020, Central Transport never contacted her about her application and never interviewed her.

140. In 2023, with more than two additional years of truck driving experience, the female driver again applied for a truck driver position with Central Transport.

141. In response to her 2023 application, Central Transport contacted this female applicant and told her to go in person and complete an application at the Horn Lake Terminal.

142. The female applicant reported to the Horn Lake Terminal and completed a paper application.

143. At the time she filled out the paper application, this female applicant had a CDL and other certifications such as Department of Transportation ("DOT") endorsements that were required by Central Transport.

144. After she filled out the paper application at the Horn Lake Terminal in 2023, Central Transport did not interview this female applicant.

145. After she filled out the paper application at the Horn Lake Terminal, the female applicant learned Central Transport interviewed a male candidate who had less truck driving experience than her.

*Chicago, Illinois Terminal*

146. During the time frame relevant to this lawsuit, a female truck driver applied for a truck driver position at Central Transport's terminal in Chicago, Illinois.

147. In response to her application, Central Transport told her they were not currently hiring any female drivers.

148. This female applicant believes the only reason Central Transport denied her employment was because she was a female truck driver.

*Blue Springs, Missouri Terminal*

149. In 2019, a female truck driver applied for a local truck driver position and a singles truck driver position at Central Transport's local terminal in Blue Springs, Missouri.

150. The female applicant had a male friend employed as truck driver at Central Transport; he told her to apply at Central Transport because they would hire her on the spot because of all of her truck driving experience.

151. When she applied to Central Transport's Blue Springs Terminal in 2019, this female applicant had close to five years of truck driving experience, as well as a CDL and DOT endorsements required by Central Transport.

152. This female applicant applied at the local Blue Springs Terminal of Central Transport at the same time as a young male applicant.

153. While applying at the Blue Springs Terminal in 2019, this female applicant overheard the young male candidate get hired on the spot.

154. This male applicant was hired by Central Transport even though his driving record showed an accident while driving a CDL vehicle.

155. In contrast, when this female applicant handed her application to the male manager at the Blue Springs Terminal, the manager told her "Someone will be in contact with you".

156. After not hearing back from the Blue Springs Terminal about her application, this female applicant called Central Transport multiple times.

157. After multiple calls, the female applicant finally reached an employee at the home office of Central Transport, which was in a different state.

158. When she asked the Central Transport employee about the status of her application, the female applicant was told her application was still pending.

159. Ultimately, Central Transport never offered this female applicant an interview.

160. After the telephone call with Central Transport's corporate office in 2019, this female applicant subsequently contacted her male friend who worked for Central Transport to see if he knew anything about her application.

161. The male employee told her that Central Transport "had a bad experience with a female and therefore they were 'shying' away from hiring women."

*North Jackson, Ohio Terminal*

162. In 2017 and 2022, a female truck driver who lived in Ohio at the time, applied for a truck driver position at the local Central Transport terminal in North Jackson, Ohio.

163. At the time she first applied to Central Transport in 2017, the female applicant had qualifications exceeding Central Transport's minimum requirements as she had eight years of driving experience, a commercial driver's license, and DOT endorsements for tanker, hazmat and double/triple trailer.

164. In addition to these qualifications in 2017, this female applicant could also drive a radius of five hundred miles and a manual transmission (i.e., stick shift).

165. In 2017, this female applicant submitted her application for a truck driver position in person at the North Jackson Terminal.

166. This female applicant recalls that the "Relations Manager" at the North Jackson Terminal, Keith Garcia, greeted her and appeared excited that she already had her hazmat endorsement.

167. During the application process, she gave Garcia her resume, her driving record, and her driver's license.

168. Garcia then told her that, based on her experience, she could make more than the starting hourly pay rate and get a signing bonus.

169. Garcia told her to wait fifteen minutes for him to fax her application over to the Recruiting Department at Central Transport headquarters.

170. Garcia returned and told the female applicat that he had received a call and that she would not be sent for a drug test.

171. When the female applicant asked him why not, Garcia responded by saying "We can't tell you; that is confidential."

172. In 2022, this female truck driver applied for a position with Central Transport through Indeed.com.

173. After she did not hear back from Central Transport, this female applicant sent Central Transport a follow-up email through Indeed.

174. This female applicant never received a response or interview from Central Transport regarding her 2022 application.

*Cheboygan, Michigan Terminal*

175. In 2019, a female truck driver applied for a local single driver position at Central Transport's local terminal in Cheboygan, Michigan.

176. At the time she applied in 2019, this female applicant had three-to-four years of truck driving experience, a CDL, and the DOT endorsements required by Central Transport.

177. When she applied for the position in 2019, the female applicant remembers the process included submitting her information through an online or "web-based" computer application.

178. In her application, she provided her driver safety record, driver's license, driving experience, ability to drive manual transmission, age, gender, physical and medical condition, and her salary requirements.

179. The female applicant was also required to take a test with questions such as "how many hours a day can you drive as a truck driver?"

180. Upon completing the test, the female applicant was notified that she was "not hirable" by the male manager at the Cheboygan Terminal but was not given a reason why.

181. In 2019, this female applicant's qualifications and driving record as a truck driver were excellent.

182. After her application and testing at the Cheboygan Terminal in 2019, this female applicant was never contacted by any Central Transport recruiter.

*Springfield, Illinois Terminal*

183. During the time frame relevant to this lawsuit, a female truck driver  twice applied for a truck driver position at Central Transport's terminal in Springfield, Illinois.

184. The first time this female applicant applied to Central Transport, she submitted her application in person at the Springfield, Illinois Terminal.

185. At the time she first applied, this female applicant had five plus years of truck driving experience, the required CDL, DOT endorsements, and the ability to drive a manual transmission.

186. This female applicant repeatedly visited the Springfield, Illinois Terminal to check on her application, but felt Central Transport gave her "the runaround".

187. She was never contacted by Central Transport regarding her first application.

188. In 2021, this female applicant applied again to the Springfield, Illinois Terminal after a family member told her that they saw a flyer advertising that Central Transport was hiring.

189. After she submitted her application to the Springfield, Illinois Terminal, this female applicant was never contacted or interviewed by Central Transport.

*Atlanta, Georgia Terminal*

190. In 2020, a female truck driver applied for a truck driver position with Central Transport's terminal in Atlanta, Georgia.

191. At the time this female applicant applied in 2020, her qualifications exceeded the minimum qualifications required by Central Transport, as she had six years of truck driving experience, the required CDL, DOT endorsements for tankers, doubles and hazmat, and ability to drive a manual transmission.

192. After a friend told her about a vacant position at Central Transport in 2020, this female applicant applied in person at the Atlanta Terminal, submitting a paper application for a local driver and a line haul position.

193. When this female applicant applied in 2020, she was aware of the "word in the trucking business [that] Central Transport did not hire females."

194. After submitting her application in 2020, Central Transport conducted an in-person interview with her at the Atlanta Terminal.

195. During this in person interview in 2020, the mail interviewer Atlanta Terminal asked this female applicant if she had children; and after the interview, the interviewer told her that Central Transport would call her in a couple days.

196. Subsequent to the interview in 2020, this female applicant received an email from Central Transport notifying her she was not selected for the position.

## FIRST CLAIM FOR RELIEF

**[Discrimination Based on Sex, Failure to Hire - 42 U.S.C. § 2000e-2(a)]**

197. The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

198. The effect of the practices complained of in paragraphs 1-194 above has been to deprive Charging Party Hamilton, Charging Party Coleman, and other qualified female truck driver applicants of equal employment opportunities and otherwise adversely affect their status as applicants and employees because of their sex.

199. The unlawful employment practices in the paragraphs above were intentional.

200. The unlawful employment practices in the paragraphs above were done with malice or with reckless indifference to the federally protected rights of Hamilton, Coleman, and a class of other qualified female truck driver applicants.

201. The EEOC is seeking relief on behalf of all aggrieved individuals who have been subjected to the unlawful employment practices complained of in the paragraphs above.

## SECOND CLAIM FOR RELIEF

**[Record-Keeping Violation - 42 U.S.C. § 2000e-8(c)]**

202. The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

203. Since at least January 1, 2015, Central Transport failed to retain and preserve personnel and employment records regarding applications for employment, including but not limited to the names of the persons interviewed as possible candidates for employment, tests and testing results, as well as notes of the interviews with the potential candidates for truck driver positions in violation of Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c), and 29 C.F.R. § 1602.14.

204. Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c), requires Central Transport to make and preserve records related to Hamilton's and Coleman's charges of discrimination against Central Transport alleging the company's failure to hire each her because of their sex, female.

205. Section 709(c) of Title VII and regulations promulgated under that provision, 29 C.F.R. § 1602.14, require employers to preserve documents relevant to an EEOC charge until action on the charge is terminated, and even in the absence of any charge, to preserve for at least one year select personnel records.

206. Defendant failed to preserve employment applications for truck driver positions from 2015 to the present.

207. Once Defendant received notice of Hamilton's and Coleman's charges with the EEOC, Central Transport had a duty to preserve the records until the final disposition of the charge.

208. While it is not known precisely when Central Transport destroyed the records, the fact that Central Transport no longer possesses the records is a violation of 29 C.F.R. § 1602.14.

209. Notably, since at least January 1, 2016, Defendant has failed to retain and preserve personnel and employment records regarding applications and positions at the Phoenix and Portland Terminals, including but not necessarily limited to notes of interviews for candidates for the truck driver positions, for a period of one year from the date of the personnel action to which they relate.

210. Additionally, although the EEOC sought applications, interview notes and other documents related to Central Transport's hiring process for applicants from January 1, 2015 through the present, Central Transport was unable to produce thousands of 2015 and 2016 paper applications and refused to produce any interview notes for the applicants during the time period from January 1, 2015 through the present.

211. For example, in addition to failing to produce copies of all requested applications to the EEOC, Central Transport also did not produce requested records such as cover pages, resumes, driver file checklists, copies of CDLs and DOT endorsements received by the local terminals for much of the time period relevant to this action.

212. Additionally, paper records that Central Transport produced did not match the data that Central Transport provided in its EEO-1 reports.

213. Notably, Central Transport produced less applications to the EEOC than the number of employees Central Transport reported hiring from 2015–2017 in its EEO-1 reports.

## **PRAYER FOR RELIEF**

Wherefore, the EEOC respectfully requests that this Court:

A.     Grant a permanent injunction enjoining Central Transport, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from

26

engaging in any employment practice which discriminates on the basis of sex, specifically failing to hire qualified female applicants for truck driving positions.

B.    Order Central Transport to institute and carry out policies, practices, and programs which provide equal employment opportunities for women and which eradicate the effects of its past and present unlawful employment practices, including sex discrimination, including policies and practices to provide equal employment opportunity training to its managers, supervisors, and non-supervisory employees who take part in the recruitment and hiring of truck drivers nationwide.

C.    Order Central Transport to make whole Charging Party Hamilton, Charging Party Coleman, and other aggrieved individuals, by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to lost wages, front pay, reinstatement, benefits, and compensation for all monetary losses.

D.    Order Central Transport to make whole Charging Party Hamilton, Charging Party Coleman, and other aggrieved individuals by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including job search expenses and other miscellaneous expenses, in amounts to be determined at trial.

E.    Order Central Transport to make whole Charging Party Hamilton, Charging Party Coleman, and other aggrieved individuals by providing compensation for past and future non-pecuniary losses resulting from the unlawful practices described above, including inconvenience, emotional pain, suffering, anxiety, stress, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

F.      Order Central Transport to pay Charging Party Hamilton, Charging Party Coleman, and other aggrieved individuals punitive damages for its malice or reckless indifference to their federally protected rights, as described above, in amounts to be determined at trial.

G.      Grant such further relief as the Court deems necessary and proper in the public interest.

H.      Award the EEOC its costs of this action.

## JURY TRIAL DEMAND

The EEOC requests a jury trial.

RESPECTFULLY SUBMITTED this 31st day of March 2026.

Catherine L. Eschbach
Acting General Counsel

Christopher Lage
Deputy General Counsel
131 M Street, N.E.
Washington, D.C. 20507

Mary Jo O'Neill
Regional Attorney

Phoenix District Office
EQUAL EMPLOYMENT
OPPORTUNITY
COMMISSION,
3300 North Central Ave., Suite 690
Phoenix, AZ 85012
Telephone: (602) 661-0059
Fax: (602) 640-5071
Email: mary.oneill@eeoc.gov

/s/ Jeff Lee
Jeff A. Lee
Senior Trial Attorney

Dallas District Office
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
207 South Houston Street, 3rd Floor
Dallas, Texas 75202
Telephone: (505) 738-6723
Facsimile: (214) 253-2749
Email: jeff.lee@eeoc.gov

*/s/ Lucia Moran*
Lucia Moran
Trial Attorney
Albuquerque Area Office
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
500 Gold Ave NW, Suite 6401
Albuquerque, New Mexico 87103
Telephone: (505) 738-6722
Email: lucia.moran@eeoc.gov

Attorneys for Plaintiff EEOC